OPINION OF THE COURT
Marsha L. Steinhardt, J.
Defendant, Haym Solomon Home for the Aged (HSHA), moves to dismiss plaintiffs claim for punitive damages asserted against it pursuant to Public Health Law § 2801-d (2) and for an order pursuant to CPLR 3212 granting summary judgment in its favor dismissing the complaint in its entirety.
Now, upon the foregoing and oral argument on July 8, 2011 and due deliberation had thereon, the motion of defendant is granted in its entirety.
This is an action wherein plaintiff claims that HSHA violated Public Health Law §§ 2801-d and 2803-c predicated on 42 CFR 483.20 (b) (1); 483.25, 483.40 and violated 10 NYCRR 415.12 (a) (1); (c) and 415.3 (a). While plaintiff states that the action is also based in negligence, he adds that no claims sounding in medical malpractice are made against this defendant.
*688 Public Health Law § 2801-d (1) states, in relevant part, that “[a]ny residential health care facility that deprives any patient of said facility of any right or benefit . . . shall be liable to said patient for injuries suffered as a result of said deprivation.” As predicate for his Public Health Law cause of action, plaintiff claims violations of 10 NYCRR 415.12, 415.12 (a) (1); (c) (2); (e) and (m). Generally these sections provide as follows: section 415.12 requires that each resident shall receive, and the facility shall provide, the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care, subject to the resident’s right of self-determination. The facility shall ensure that a resident’s abilities in activities of daily living do not diminish, unless circumstances of the individual’s clinical condition demonstrate that diminution was unavoidable. (See § 415.12 [a] [1].) A resident having pressure sores shall receive necessary treatment and services to promote healing, prevent infection and prevent new sores from developing. (See § 415.12 [c] [2].) A resident with a limited range of motion shall receive appropriate treatment and services to increase range of motion and/or to prevent further decrease in range of motion. (See § 415.12 [e] [2].) The rules also provide that residents be free of any significant medication errors. (See § 415.12 [m].) The facility shall ensure that all residents are afforded their right to a dignified existence, self-determination, respect, full recognition of their individuality, consideration and privacy in treatment and care for personal needs and communication with and access to persons and services inside and outside the facility. (See § 415.3 [a].) Additionally, plaintiff claims that violations are also predicated upon 42 CFR 483.25 (c), which is equivalent to 10 NYCRR 415.12 (c), requiring that the facility must ensure that a resident who enters the facility without pressure sores does not develop same and that a resident having pressure sores receives necessary treatment and services to promote healing, prevent infection and prevent new sores from developing.
As part of his claims pursuant to the Public Health Law, plaintiff seeks punitive damages against HSHA. Public Health Law § 2801-d (2) states, in relevant part, that “where the deprivation of any such right or benefit is found to have been willful or in reckless disregard of the lawful rights of the patient, punitive damages may be assessed.”
In particular, plaintiff alleges that the moving defendant violated decedent’s rights by failing to provide wound care to *689 left foot ulcers and by failing to implement changes in Mr. Butler’s treatment plan to increase the frequency of dressing changes and include Silvadene applications to that foot. He claims that as a result of these failures, Mr. Butler’s wounds did not improve and became infected, causing sepsis, respiratory failure and death. Plaintiff also claims that HSHA’s staff violated Mr. Butler’s rights by routinely failing to assess for pain and, accordingly, administer pain medication. Plaintiff claims that the inability to manage Mr. Butler’s pain resulted in his loss of appetite, weight loss and further debilitation.
The records reveal that on July 15, 2003, while a patient at Maimonides Medical Center, decedent, John Butler, underwent a left common femoral artery to below-knee popliteal artery bypass with translocated nonreversed greater saphenous vein to provide revascularization to the left lower extremity due to gangrene on his left foot. Upon discharge on July 29, 2003, Mr. Butler, a 91-year-old man weighing 70.9 lbs, was admitted to defendant Haym Solomon Home for the Aged for short-term rehabilitation. Mr. Butler remained at HSHA until August 12, 2003 when he was transferred to Maimonides, where he died the following night.
Mr. Butler’s records from HSHA note that on admission he was emaciated with no complaints of chest pain or shortness of breath but congested on auscultation. His diagnoses included peripheral vascular disease, left foot cellulitis, left foot gangrene necrosis, chronic obstructive pulmonary disease, diabetes mellitus, hypertension and atrial fibrillation. The nurse’s note, on admission, indicates decedent had two stage IV ulcers with black necrotic tissue on the dorsal aspect of the left foot, one measuring 20 x 16 cm with scant serous drainage and one measuring 5 x 5 cm with no drainage; a stage IV ulcer to the inner left ankle with black necrotic tissue measuring 7x5 cm with no drainage; a stage IV ulcer on the left heel with black necrotic tissue measuring 11 x 7 cm with no drainage; a stage II ulcer on the sacrum with pinkish tissue measuring 3.5 x 1 cm with scant serous drainage. Stage IV ulcers are wounds where full thickness of skin and subcutaneous tissue are lost, exposing muscle or bone. The note indicates that Mr. Butler had gangrene to the dorsal aspects of all five toes on the left foot. According to the weekly pressure ulcer reports dated July 29, 2003 and August 7, 2003, Mr. Butler’s ulcers remained the same throughout the admission with the exception of the sacral ulcer, which decreased by .5 cm.
*690 At the time of his admission, decedent was taking, as prescribed, Megace, K-Dur, Protonix, Toptol, Lasix, Flovent and vitamin C. Mr. Butler was also kept on a course of the antibiotic Keflex, continued from his recent vascular surgery. The physician’s admitting/interim orders directed the staff to clean the foot ulcers and apply wet to dry dressings and to wash the sacral ulcer with normal saline and apply Silvadene and dressr ing at every shift. A gel cushion was ordered to be placed on decedent’s wheelchair. Physician’s orders on July 30, 2003 called for physical therapy six times a week for gait training, transfers, bed mobility, and balance and for two pillows to be used under decedent’s knee for positioning.
The Centers for Medicare and Medicaid Services requires nursing homes to complete the Minimum Data Set, which is a document that includes information about residents’ health, including their pain levels at various periods during their stays. According to section J of the Minimum Data Set, Mr. Butler experienced moderate pain, less than daily. Additionally, the physician’s order form from July 30 included Tylenol No. 3, two tablets orally every four hours, as needed, for pain. Nurse’s medication notes indicate that Tylenol No. 3 was given to Mr. Butler, resulting in relief, on August 7, August 8, August 10 and August 12.
The nurse’s notes from July 29 to Mr. Butler’s discharge on August 12 indicate that treatment was administered every day to decedent’s left leg and sacral area. As noted above, this treatment involved cleaning the ulcers and wet to dry dressing changes to the foot ulcers and saline wash, Silvadene application and dressing change to the sacral wound. The nurse’s notes document that this care was provided, on average, four times a day.
On July 31, while the left foot was treated, an odor was noted. The sacral ulcer was observed to be without any drainage. On August 4 at 9:00 a.m., the attending physician removed some of the surgical staples from the left leg incision, noting no bleeding. A nurse’s note at 10:00 p.m. states that an odor was noted from the large necrotic ulcer on the dorsal aspect of the left foot. Dressing changes and treatment to the left foot and sacral area were continued as ordered.
Physical examination by the attending physician, on August 5, revealed no signs of infection and dressings were intact on the left foot and sacrum. Physician’s orders directed that staff observe and monitor for any signs of infection. On August 6, *691 the attending physician indicated that the patient was in no apparent distress and afebrile, with wounds healing well. A surgical consultant examined the patient that day and noted that the condition of the left foot was poor with multiple areas of dry and wet gangrene. He recommended a vascular consult and suggested Silvadene dressings at every shift. The nurse’s notes document that Mr. Butler was seen by a surgeon and that a vascular consult was proposed. On August 7, when treatment was rendered to the left leg, the area was noted to be painful and moist, with odor and drainage. Pain medicine was administered. On August 8, a consulting physiatrist examined Mr. Butler and recommended “dressing changes” at every shift “as per surgery.”
Notwithstanding the recommendations by the consulting physicians, there are no HSHA records indicating that the attending physician wrote an order following the suggestion of the surgeon or the vascular specialist to apply Silvadene dressings to the patient’s left foot or that the nursing staff implemented such an order. Nevertheless, wound care was continued pursuant to the original order of the attending physician, which dated back to the time of Mr. Butler’s admission.
The physician’s interim orders from August 11 directed pain medication to be administered to Mr. Butler 30 minutes prior to dressing changes. The nurse’s notes of August 11 indicate awareness of the physician’s interim orders. At 10:00 p.m., the decedent was noted to be disoriented, mumbling, and highly agitated in bed. Mr. Butler refused his second dose of pain medication, yet showed discomfort during dressing change to left foot. His appetite decreased and he became increasingly lethargic.
On August 12, Mr. Butler was transferred to Maimonides Medical Center with an elevated respiration rate and decreased level of consciousness. Upon admission to Maimonides, Mr. Butler, weighing approximately 74 lbs, was noted to be cachectic, hypotensive, and in respiratory distress. A skin integrity assessment noted that the patient had a necrotic left foot, a superficial stage II wound on the left groin, and a stage II sacral wound measuring 3x3 cm. Mr. Butler was in stable condition when transferred to the medical floor. Blood tests revealed that his white blood cell count was 31. A sputum culture was ordered and antibiotics were to be started because of the left foot gangrene. Mr. Butler was to receive oxygen, intravenous fluids and other palliative care. However, as Mr. Butler’s family members requested that he be only given comfort measures, *692 interventions such as a nasogastric tube and MRI, to rule out osteomyelitis, were not performed. Mr. Butler died on the evening of August 13, 2003. The death certificate indicates that he died of cardiopulmonary arrest due to chronic obstructive pulmonary disease.
In support of its motion to dismiss punitive damages and for summary judgment, HSHA submits the affidavit of Frederick Sherman, M.D., a physician board certified in geriatrics and internal medicine. In response to claimed violations of Public Health Law § 2801-d and 10 NYCRR 415.12, the expert states that Mr. Butler did not develop any pressure ulcers at HSHA and that the ulcers he had on admission did not progress during his stay at the facility. Rather, they essentially remained unchanged. He states that the records document the staffs efforts to improve or heal the ulcers, including skin assessments, cleansing the ulcers, application of wet to dry dressings every shift, and repositioning the patient every two hours. The expert opines that the wound care given to Mr. Butler was appropriate and rendered pursuant to physician’s orders.
In response to other enumerated claimed statutory violations, the expert notes that the record does not evidence any neglect of Mr. Butler or his conditions, that he received the appropriate treatments and medications and the staff followed all physician’s orders, including antibiotic therapy. Dr. Sherman states that Mr. Butler received physical and occupational therapy and that there is no evidence to suggest that his range of motion worsened during the admission and that he did not experience a decrease in activities of daily living, as he came to the facility in a totally dependent state.
Dr. Sherman states that Mr. Butler was not injured, did not become infected and/or die as a result of HSHA’s claimed negligence or failure to conform to the Public Health Law and related statutes. The expert opines that the decline in Mr. Butler’s medical condition and resulting death were secondary to his multiple comorbidities, including peripheral vascular disease, chronic obstructive pulmonary disease, diabetes, history of cellulitis and atrial fibrillation. He states that the death certificate indicates that Mr. Butler’s cause of death was cardiopulmonary arrest due to, or as a consequence of, chronic obstructive pulmonary disease. In his opinion, Mr. Butler was in the end stage of life and in the active stage of dying at the time of his admission to HSHA.
Plaintiff, in opposition to the motion, submits an affidavit from Karim J. Khimani, M.D., a physician board certified in *693 internal medicine and geriatrics. Dr. Khimani opines that defendant failed to prevent the deterioration of multiple skin ulcers while decedent was a resident at HSHA. As a result of this failure, the ulcers became infected, which led to sepsis and, ultimately, death. The expert states that HSHA failed to provide wound care to the left foot wounds as ordered by the physician and failed to follow the changed plan of treatment to apply Silvadene dressings at every shift. Dr. Khimani opines that the failure to provide the wound care “to Mr. Butler’s affected left foot wounds caused the wounds to deteriorate and become infected.” He states that prior to August 4, 2003, decedent’s wounds did not have an odor but that, on that day, the nurse’s note indicated that Mr. Butler had a foul odor and had increased drainage from the large dorsal foot wound. The expert states that the following day a care plan was developed which called for Silvadene dressing changes every shift, to avoid infection. The expert states that the nursing staff at HSHA failed to transcribe these orders and implement treatment. He opines that Mr. Butler’s elevated white blood cell count before his death signifies an infection.
Plaintiffs expert also states that HSHA failed to routinely assess for pain and administer sufficient pain medication, and that this failure contributed to Mr. Butler’s decline in appetite and resulting weight loss. He opines that unrelieved pain likely contributed to the decedent’s decrease in appetite and the onset of restless, agitated and combative behaviors.
Dr. Khimani concludes by stating that defendant violated the Public Health Law and the concomitant federal regulations. Additionally, he says that HSHA violated its own policies by not taking photographs of the wounds upon admission; not modifying the wound care plan; delaying the development of the care plan; and not notifying the physician of the foul odor coming from the left foot. He opines that the elevated white blood cell count obtained at Maimonides evidenced infection resulting from inadequate care of the ulcers.
It is well settled that claims to recover damages for deprivation of rights under the Public Health Law are separate and distinct and involve considerations different from those sounding in medical malpractice and/or negligence. (Zeides v Hebrew Home for Aged at Riverdale, 300 AD2d 178, 179 [1st Dept 2002]; Sullivan v Our Lady of Consolation Geriatric Care Ctr., 60 AD3d 663 [2d Dept 2009].)
As to punitive damages, medical malpractice cases hold that
*694 “[p]unitive damages are warranted where the conduct of the party being held liable evidences a high degree of moral culpability (Giblin v Murphy, 73 NY2d 769, 772) or where the conduct is so flagrant as to transcend mere carelessness (Frenya v Champlain Val. Physicians’ Hosp. Med. Ctr., 133 AD2d 1000, 1001), or where the conduct constitutes willful or wanton negligence or recklessness (Home Ins. Co. v American Home Prods. Corp., 75 NY2d 196, 204). It is not necessary that the conduct complained of be intentionally harmful (see, Home Ins. Co. v American Home Prods. Corp., supra-, Gruber v Craig, 208 AD2d 900, 901).” (Rey v Park View Nursing Home, 262 AD2d 624, 627 [2d Dept 1999].)
In Rey v Park View Nursing Home, plaintiff sought punitive damages against a nursing home for negligence and malpractice in repeatedly failing to prevent the decedent from falling out of her wheelchair and reclinen The court affirmed the lower court’s dismissal of the punitive damages claim, finding that such conduct did not warrant punitive damages. In Lee v Health Force (268 AD2d 564 [2d Dept 2000]), plaintiffs sought punitive damages against a health care aide and her employer for burns caused by scalding water as their disabled child was bathed by the aide. The Second Department denied punitive damages, finding that defendants’ conduct did not manifest a high degree of moral culpability, and did not constitute willful or wanton negligence. Similarly, in Kraycar v Monahan (49 AD3d 507 [2d Dept 2008]), a negligence action involving a motor vehicle accident, the Second Department stated that “[p]unitive damages are recoverable in a negligence action only where the conduct in question evidences ‘a high degree of moral culpability,’ or ‘the conduct is so flagrant as to transcend mere carelessness’ and ‘constitutes willful or wanton negligence or recklessness.’ ” (Kraycar at 507 [citations omitted].) Notably, these cases did not assert a cause of action pursuant to the Public Health Law; the claims were based on negligence, or medical malpractice, or both.
While there is ample appellate guidance on the issue of awarding punitive damages in negligence and medical malpractice actions, there is little direction as to the burden under the Public Health Law. Trial courts have held that the standard to recover punitive damages under Public Health Law § 2801-d (2) “appear[s] to be a less stringent standard than that under the law governing malpractice.” (Osborne v Rivington House-Nicholas A. Rango Health Care Facility, 19 Misc 3d 1132[A], 2008 NY *695 Slip Op 50975[U], *6 [Sup Ct, NY County 2008].) In contrast, punitive damages sought pursuant to the Public Health Law were dismissed where plaintiff presented no evidence of “reckless or wanton conduct that might support an award of punitive damages.” (Passet v Menorah Nursing Home, Inc., 16 Misc 3d 1117[A], 2007 NY Slip Op 51452[U], *3 [Sup Ct, NY County 2007], citing Morton v Brookhaven Mem. Hosp., 32 AD3d 381 [2d Dept 2006] [a medical malpractice case].)
In the absence of appellate guidance, the statute itself must provide direction.
“As a general rule of statutory interpretation, application of a statute’s clear language should not be ignored in favor of more equivocal evidence of legislative intent . . . [, and]
“the most direct way to effectuate the will of the Legislature is to give meaning and force to the words of its statutes.” (Desiderio v Ochs, 100 NY2d 159, 169 [2003].)
Thus, “ ‘where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning.’ ” (Kash v Jewish Home & Infirmary of Rochester, N.Y., Inc., 61 AD3d 146, 149 [4th Dept 2009], quoting Pultz v Economakis, 10 NY3d 542, 547 [2008].)
In light of the aforementioned, this court will use the clear language of the statute as parameters for its determination herein. Black’s Law Dictionary defines “willful” as voluntary and intentional, but not necessarily malicious. “Reckless” is characterized by the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash. (Black’s Law Dictionary [9th ed 2009].) Thus, using the plain meaning of the words “willful” and “reckless,” in order to prove a claim seeking punitive damages pursuant to Public Health Law § 2801-d (2) the conduct of the staff of a nursing home must have been voluntary and intentional or must have created a substantial and unjustifiable risk of harm with a conscious disregard of, or indifference to, that risk.
In the instant matter, plaintiff argues that punitive damages are warranted because the nursing home failed to follow physician’s orders regarding wound care to decedent’s left foot and failed to implement changes in the physician’s wound care plan which included dressing changes with Silvadene to the left foot. He contends that these failures caused Mr. Butler’s wounds *696 to become infected leading to an elevated white blood cell count, sepsis and death. He also claims that the staff failed to notify the physician of the odor from the left dorsal foot wound noted in the nurse’s note of August 4. He asserts that a delay in reporting the odor to the physician resulted in a delay in treating and diagnosing the wounds. Additionally, plaintiff claims that Mr. Butler was not properly assessed for pain or given adequate pain medication which he claims most likely contributed to his decline in appetite and subsequent weight loss. Plaintiff adds that treatment administration records, missing from Mr. Butler’s chart, would show the frequency of Silvadene dressing changes and the turning and repositioning of the patient. Plaintiff argues that these failures and violations warrant punitive damages and urges the court to deny defendant’s motion to strike punitive damages.
However, upon review of the evidence submitted, including the records from HSHA and affidavits of the experts, the facts in this case do not manifest a willful deprivation of a right or benefit or a reckless disregard of a lawful right or benefit due to Mr. Butler to permit his estate to maintain a claim for punitive damages. Indeed, the records document that wound care was provided to Mr. Butler up to four times per day while he was a patient at HSHA and that the ulcers that he had upon his admission to HSHA did not deteriorate during his stay. The records also document that Mr. Butler received constant nutritional support and was administered pain medication when needed. Therefore, in light of the aforementioned, plaintiffs claims for punitive damages must be dismissed.
In a summary judgment motion, the movant “must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact.” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]; Zuckerman v City of New York, 49 NY2d 557 [1980].) The proponent of a summary judgment motion must tender evidentiary proof in admissible form eliminating any material issues of fact from the case. (See Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) Failure to make a prima facie showing requires denial of the motion regardless of the sufficiency of the opposing papers. (See Alvarez v Prospect Hosp., supra, Winegrad v New York Univ. Med. Ctr., supra.) If the proponent succeeds, the burden shifts to the party opposing the motion, who then must show the existence of material issues of fact by pro *697 ducing evidentiary proof in admissible form, in support of his position. (See Zuckerman v City of New York, supra.)
Relevant here is that
“[t]he statutory basis of liability [under Public Health Law § 2801-d] is neither deviation from accepted standards of medical practice nor breach of a duty of care. Rather, it contemplates injury to the patient caused by the deprivation of a right conferred by contract, statute, regulation, code or rule” (Zeides v Hebrew Home for Aged at Riverdale, 300 AD2d 178, 179 [2002], citing Public Health Law § 2801-d [1], [2].)
Public Health Law § 2801-d (1) further provides that “[n]o person who pleads and proves, as an affirmative defense, that the facility exercised all care reasonably necessary to prevent and limit the deprivation and injury for which liability is asserted shall be liable under this section.”
In this case, HSHA made a prima facie showing of entitlement to summary judgment, establishing that its conduct did not deprive Mr. Butler of any right or benefit established under the claimed statutes or regulations. Additionally, defendant met its burden by showing that Mr. Butler’s injuries were not caused by any negligent acts or omissions or by a violation of a right or benefit owed to him. Defendant HSHA established, prima facie, that Mr. Butler’s preexisting ulcers did not worsen or deteriorate during his stay at the facility and that new wounds did not develop. In fact, the record shows that the sacral ulcer improved slightly by the time of his transfer to Maimonides.
Plaintiff, in opposition, failed to raise a triable issue of fact to defeat the motion for summary judgment because the submissions consisted entirely of conclusory statements and unsubstantiated allegations. (See Zuckerman v City of New York, supra; Shapiro v Gurwin Jewish Geriatric Nursing & Rehabilitation Ctr., 84 AD3d 1348 [2d Dept 2011]; Eckman v Cipolla, 77 AD3d 704 [2d Dept 2010]; Simmons v Brooklyn Hosp. Ctr., 74 AD3d 1174 [2010]; Sheenan-Conrades v Winifred Masterson Burke Rehabilitation Hosp., 51 AD3d 769 [2d Dept 2008].)
Other than speculation, there is also no showing by plaintiff that any infection was caused by the violation of the Public Health Law or negligence by defendant nursing home. Plaintiff s claim that the wounds became infected is belied by the presence of wet and dry gangrene and necrosis on the left foot at the time of admission. In fact, the record indicates that these *698 wounds remained the same size throughout the admission and the sacral wound slightly decreased in size. Moreover, the contention that the allegedly infected wounds caused sepsis and death is not supported by the record and is unsupported by his expert whose opinions are speculative and conclusory. The claim that Mr. Butler became emaciated while at HSHA is also controverted as the record notes a weight gain of almost four pounds at the time of his transfer to Maimonides. Notably, the expert does not address the numerous medical conditions plaguing Mr. Butler prior to and during the HSHA admission, nor their impact on Mr. Butler’s morbidity. He summarily concludes that death resulted from the claimed violations. Furthermore, although the expert claims that an elevated white blood cell count indicates infection, he does not indicate how any claimed failure by the HSHA staff caused the infection, allegedly resulting in Mr. Butler’s death.
Likewise, the claim that the staff did not advise physicians about a foul odor coming from the left leg is undermined by notations in the record that the physician examined Mr. Butler prior to the observation, and again, the very next day. While plaintiff claims that the nursing home failed to implement the recommendations made by the surgical consultant to apply Silvadene to the left foot, he ignores the fact that these recommendations were never ordered by a physician. There can be no violation by the HSHA staff when there was no order in effect.
Additionally, plaintiff claims that treatment administration records, which should have documented dressing changes or the lack thereof, are missing from the decedent’s nursing home record. These missing records, plaintiff argues, constitute an issue of fact precluding summary judgment. This argument, however, is not persuasive. Notwithstanding the missing documents, there are voluminous nurse’s notes documenting wound inspection and dressing changes. As such, the missing documents would be duplicative and therefore immaterial given the vast other documentation generated in the two-week period. Moreover, these “missing” records could not have proved a deprivation of a right or benefit when the records submitted herein fail to evidence a Public Health Law violation. (See Shapiro v Gurwin Jewish Geriatric Nursing & Rehabilitation Ctr., 84 AD3d 1348 [2d Dept 2011].)
Plaintiff also fails to raise an issue of fact sufficient to defeat summary judgment based on other incidences of claimed violations including the allegation that decedent’s rights were *699 violated by a failure to provide pain medication. This is similarly not supported by the record, nor is the claim that such failure physically weakened Mr. Butler leading to his death.
Inasmuch as plaintiff fails to raise an issue of fact on the negligence claim or on the Public Health Law claim, summary judgment is granted as to defendant Haym Solomon Home for the Aged. The action is hereby severed as against the remaining defendants and the Clerk of the Court is directed to enter judgment accordingly.